Case number 14-7055, Lorie A. Giles, Appellant v. Transit Employees Federal Credit Union. Mr. Goldberg for the Appellant, Mr. Hyman for the Appellee. Thank you. May it please the Court. In an adversary proceeding before the EEOC, the defendant said the following. As part of a general organizational review, the decision was reached to lay off Ms. Giles. It was reached by outgoing President Perseus Felder and incoming President Rita Smith. This decision was made, I'm quoting, for business reasons only, as the duties for which Ms. Giles was primarily responsible no longer require a TEFCU employee. But more than three years later, in deposition, Ms. Smith said the following. Question, so you fired her for performance reasons? Answer, yes. Question, not because there was a reorganization? Answer, uh-huh, no. For me, it was performance, J.A. 269. These two irreconcilable positions show the defendant's reasons were pretextual and, quote, unworthy of credence. And because, as this Court and the Supreme Court have held, untruthfulness is consciousness of guilt. This alone is enough to survive summary judgment. Is that, I don't believe that we have gone so far as to say that if you find pretext, you automatically get a trial. It still can be, overall, the evidence can still be so weak that discriminatory intent was the motivating factor for the termination or the employment action that even if a reasonable jury could find that the stated reason was a pretext, the employer could still win on summary judgment. Didn't we say that in ACCA and haven't we said that in other cases? Yes, Your Honor. ACCA, which was endorsed by the Supreme Court, provided two possible examples. But here, there was also additional evidence. ACCA says that it can be enough, but may not be enough. But here, there is more. For instance, the defendant admitted that it received the advice of its human resources consultant, Shirley Broder, that the defendant should not hire Ms. Jowles because of her MS. And what this Court has repeatedly said is that the evidence of pretext, taken together with other evidence, circumstantial evidence, can also show that summary judgment should be defeated. And here, there are multiple genuine issues of material fact. For instance, the parties disagree on whether Ms. Jowles was actually fired for performance reasons. The former and current CEOs said yes, but Ms. Jowles and her former supervisor said no. In fact, her former supervisor said she could not have been fired for performance reasons. He wasn't even her supervisor. He wasn't her direct manager, but he was her supervisor, a fact he stated that he swore to in his declaration. And there was no evidence, either to this Court or here, that he was not her supervisor. During discovery, a request was made for an organizational chart. There was none. There's just no record evidence that he was not her supervisor. She says he was, and he says he was. They both swore to him. And he says that in the nearly one year before she was fired, she was a good performer. She made no major mistakes. This major scanning mistake that the CEOs claimed that she made, there's no record evidence of it. They were asked to produce it. They couldn't. When you say she says he was the supervisor, when she was asked about who her supervisors were, she didn't name him, although she ticked off some other names. She had many jobs at the credit union. And what she did was she ticked off her direct managers. But that does not mean it was a conclusive list. In fact, in her declaration, she says he was, in fact, my supervisor. He wasn't her immediate manager, but he was her supervisor. And he was responsible for reviewing, although not signing, her performance reviews. And he said she was a good employee. He says there was no major mistake the entire year, that for the more than 11 months before she was fired, she made no major mistakes at all. What is the evidence that at the time of the termination they considered her multiple sclerosis? Well, as we know in the briefs, there was increasing upward pressure on the insurance premiums. They went up by large double-digit factors every year. The pages that you cite in your brief to the appendix don't show that. I read your brief. I tried to cross-reference it to the appendix, and I just don't see it. I don't have it in front of me, but there are a series. It's more than a dozen pages, I think, of lists of how much each employee's premium costs. And they're broken down to people who have dental and individual coverage. And if you look at the individual coverages for each year, they're in the right column. Those numbers that are in the table match to the individual lists each year. All right. Well, I guess I'll take your word for it, but I can't, when I'm reading a brief, I can't, and I don't think it's my job to try to sort through the evidence and figure out whether it supports the point that you're making when you cite one page, but now you're saying that there's a range of pages that prove that point. I apologize. When I come back on rebuttal, I can point them out. In addition to the issue of pretext, there were multiple issues, genuine issues of material fact. As I mentioned, this issue of performance. The next question is, did the defendant believe that Ms. Giles was driving up insurance rates? And indeed, a reasonable jury could infer that it did believe that. The company knew that Ms. Giles had MS. It was not a secret. It knew, as Ms. Felder admitted, she believed Ms. Giles that her medical costs were expensive. It knew that she was limping. Ms. Felder noted that she limped more, and she stumbled more, and she got worse. But they knew that she had MS before they hired her. In fact, they were advised not to do so, and they hired her anyway, which I would think weighs against your argument. I think normally that would be true. There are many cases in which, for instance, an individual who hires a woman is alleged to have fired her because she's a woman, and it doesn't make sense because she was a woman when they hired her. Ms. Giles did have MS when they hired her, but she was essentially asymptomatic. And her MS did not get worse until she was already working there. She was basically fine when they hired her. But she started to stumble and use a cane and have these expensive infusions only after she had been working at the EFCU for a while. And so she wasn't really the same MS patient she was when she was hired. When she was fired, she was very expensive. Well, I think the insurer here says that they rely on community rating. So no individual's cost would be significant unless they were so significant. Well, the insurer says that it relies on community rating, but it adds to that. And in fact, it says, this is JA 344, renewal rates are calculated using the community claims experience. But it adds, in addition, factors such as prescription drug utilization, legislative mandates, and provider utilization play key roles in determining health care costs. That is to say that in addition to the community claims experience, prescription drugs, which is a factor here, and doctor utilization, which is a factor here, change the cost. And these letters came every year, and the CEO had to sign them every year. Presumably she had read them. She had seen them before. And so the company knew that it was more than just community rating, that it was additionally these other factors. And those are, in fact, the factors that caused Ms. Giles. Can you just tell me, give me a number of how much her medical bills were costing the employer and how much it increased from the time, you know, over the past three or four years before she terminated? Can you just give me a number now? The only number I can give you is that her infusions were $4,000 a pop. They happened about monthly. I don't know what her doctor's cost was, but the key is that the company knew that they were expensive. Ms. Felder admitted that she knew they were expensive. And although we don't know the exact number, that's true. Do we know how much the employer had to pay for it? The employer only paid the premiums, Your Honor. But the premiums were being increased by Ms. Giles. The insurance company pays the medical bills. Okay. So how much did the premiums increase? Give me a dollar. I don't have a way to know how much exactly they increased, but they increased a lot during only that time. And this is the time that she was getting so much work. Okay. You said that they increased a lot over that time. What is a lot? What increased? The premiums for individual insurance increased over 50%. Each year, from 2008 to 2009, it was a 21% increase. From 2009 and after, it was a 19% increase. These were major increases that were much larger than, say, the 2007-2008 increase of only 7%, and much larger than the decrease. It essentially flattened out after she was fired. Does that answer your question? And when you say it flattened out, you're saying as to all the premium, the total amount that it was paying as for all of its employees or the average for individuals? Your Honor, just for individual coverage, all individuals were paying essentially the same amount. And not for family, but for individual coverage, the increase stopped and flattened out. It dropped a little bit. For the first time. Are you arguing that if this termination was based on the cost of her insurance, that this is disability discrimination under the ADA? Yes, Your Honor. There are not many courts that have struggled with this particular issue. But they have struggled with another similar issue, and it's also been addressed by the EEOC. First, there's an associational claim if somebody is associated with a person who has a disability and costs have increased. The courts have quite often found that that is a discrimination under the ADA. In addition, the EEOC has since 1990. Wait, I don't understand that. Can you repeat that? The ADA has multiple provisions, and one of them is that you cannot discriminate against a person if she is associated with someone who has a disability. For instance, maybe her husband has cancer. And if her husband's cancer is increasing the insurance rates, courts have found that that is enough to satisfy an associational disability claim. So to find that there is no claim here under the ADA, it would mean that being associated with someone with a disability who is increasing insurance rates would satisfy the ADA. But just the person who is disabled's increases would not. In addition, the EEOC, in its technical assistance manual, has since 1992 believed that this is enough. As the Supreme Court held in FedEx v. Hullo Whiskey, the EEOC's pronouncements are entitled to Chevron. Excuse me, to, my mistake, Skidmore deference, assuming they have been constantly applied. And since 1992, the EEOC has said in its technical assistance manual, this is, the first one is section 7.8, an employer cannot fire or refuse to hire an individual with a disability because the employer's current health insurance plan does not cover the individual's disability or because the individual may increase the employer's future health care costs. And this comes up again and again in the technical assistance manual, section 6.4 about medical exams, section 9.10 about assessment of risk. And in fact, in its appendix to the regs, under qualified individual, it says that determination about whether somebody is qualified should not be based on speculation that the employee may become unable in the future or may cause increased health insurance premium. And as far as I understand, the EEOC has never wavered from this belief. I say that while I'm overstating my time. No further questions? May it please the Court. The district court said correctly, I believe, that at summary judgment, it's about evidence. What's the evidence? What does the evidence say? Are there substantial questions? The evidence, the actual evidence, was that in 2008, the plaintiff was such a poor employee, as the receptionist, she was involved in altercations with members of the credit union. And rather than fire her, which the CEO at the time testified she was remiss to do, she said she didn't like to fire anybody. She liked to give people a chance. She said, you know what, we'll give you a different job where you don't interact with the public. So on the evidence of whether she was a poor employee, you have a declaration from a person who swears that he was her supervisor. Sure. That says she wasn't a poor employee. And as far as I could tell from your brief, your answer to that is that he's lying. And I don't know that that is, it's hard to see how that's not an issue that should go to the jury. It's not even a question of he's lying. She testified. She's lying. Somebody's lying in your view. It's not even a question of she's lying. I thought you said that in your brief. Well, the evidence is that this person who comes in at the 11th hour and says, I'm her supervisor and says all these things about her, the evidence is that he's not her supervisor. The court looked at the evidence, which is who signed the performance evaluations and who the plaintiff herself testified was her supervisor, and, you know, the court decided that that was the evidence. Did the court mention this definition? I don't believe that the court specifically mentioned it. I think what the court said is— And why wouldn't it be enough if you have a sworn declaration from somebody who swears that they're the person's supervisor? I'm just talking about the issue of pretext. I understand that there's a follow-on inquiry of whether a pretext is enough. Sure. But on this question of whether there's a genuine issue of material fact on whether the stated reason was pretextual, why isn't it enough to have somebody who swears that they're a supervisor say she was a good performer? Well, I think the evidence is clear that he, in fact, was not the supervisor. I think the court evaluated the evidence in front of them, didn't make a credibility determination. Do you think there's no genuine issue of material fact, even though she says he was her supervisor, he says he was her supervisor, and nobody says he wasn't, as far as I can tell? Is there any evidence that says he wasn't the supervisor? Yeah, the plaintiff's own testimony in her deposition. But then she says that he was her supervisor. Well, then that's contradictory testimony, and the court— I think if you look at—if you want to not believe anybody, if you just say, okay, the depositions say what they say, everybody says what they say, but I'm the court, and I'm going to look at the evidence, and I'm not going to make any credibility determinations, and there's—the plaintiff says one thing, and then she says something else. But if I look at the performance evaluations, and I look at all of the documentary evidence, I look at all of the e-mails, there is no evidence that this Stephen Bradham is, in fact, her supervisor. In fact, it's clear that— So in summary judgment, you're allowed to look at the documentary evidence and ignore the testimonial evidence? I don't believe that that's what happened, and I don't believe that that's what the court is saying, and I'm not really suggesting that. I'm saying to the extent that the court has to decide what the evidence is and weighing all of the factors in front of the court, the court chose the evidence that it thought was— the court considered the evidence that it felt stated what the facts were at the time. So the statements in the declaration, is that not evidence? I—you know, I suppose that it could be. Could be. What is non-evidentiary about a sworn statement in a declaration? Why isn't that evidence? It seems to me your argument is that there's evidence that says this. There's other evidence that disproves it. Well, the declaration wasn't provided during discovery. It didn't come in until it was time to file briefs. The first time we ever saw this supposed declaration— It's standard practice in summary judgment motions that people will attach declarations. If you want to challenge it, you can move to strike it, or you can seek further discovery by way of a deposition of that individual, but it's not improper to submit a declaration to a summary judgment motion. But I think that even if, as you asked, even if that provides for pretext, I think the court considered it and decided, in consideration of all the evidence, that in fact, that the termination was not made for discriminatory reason. There was no pretext. You know, the court really didn't say anything about Mr. Bradham's declaration, didn't really say anything about Mr. Bradham, period. I mean, I will agree with you that the court didn't really say anything, but I think the court weighed all of the evidence and said, this is where I come down. On that issue, the court seemed to assume that, relevant to the question that Judge Brown was asking your friend on the other side, that making a decision based on costs of somebody who has a disability doesn't constitute discrimination on the basis of disability. As I read your brief, you don't endorse that rationale. I don't think that there's any evidence that the employer made a decision based on cost. I know that the plaintiff really wants that to be true, but there's simply no evidence because when asked about, you know, did you consider the cost of health insurance, both of the CEOs said, you know, yeah, when it came time for renewal, we looked at it, we evaluated the, you know, the benefits to the employees and we decided on what the best plan was. I thought that the point was that the district court, I think, inferred the plaintiff's argument to be the defendant, the employer, your client, took into account cost of disability, but that wouldn't even matter because that doesn't constitute, at least for the ADA claim, that wouldn't constitute discrimination on the basis of disability. And then in your brief, as I read your brief on appeal, you don't endorse that rationale. You seem to not dispute that making a decision based on costs generated by disability would be discrimination based on disability. But you have other reasons that we should affirm, right? I get that. Yeah, I would agree that if the employer made the decision to terminate based on cost, if there was evidence that that's what the court, that that's what my client did, that maybe we would get a different result. The issue is on summary judgment, there's simply no evidence. And I know I've said that about 100 times in my brief, but, I mean, that's really what this comes down to is what is the evidence, what is the defendant able to prove, what is the plaintiff able to prove. And in terms of, you know, getting into this issue of how much did it cost to insure Ms. Childs, the only evidence, if you want to call it that, of how much it cost, is that one time Persis Felder testified that Ms. Childs told her that the treatment was costly. Well, that doesn't in and of itself mean anything to me or, frankly, to the credit union. And coupled with Ms. Childs' own testimony that she actually believed that the employer was paying her medical bills, which obviously is not the case. I mean, I don't think there's any dispute of fact that, you know, the employer was paying the premiums and the insurance company was paying the medical bills. You know, and you asked Mr. Goldberg, and he said, I don't, you know, I don't know, and it's unknowable, how much any single individual is costing in terms of increases or decreases or changes in rates. Well, your friend on the other side says, you know, look at our brief and page, I guess it's 41 in their brief where they have a table where they show premiums going up year after year and then they plateau after Ms. Childs' term. Now, there's a page that's cited in the appendix for this, and when I look at that page, I can't see where this data appears on that page, but put that aside. Well, let's not put it aside. Do you dispute these numbers? Well, the numbers in the table on page 41 accurately represent the cost. For instance, in August, at the August 2009 renewal, I believe that it correctly states it was $449 cost to the employer per month to provide insurance to individuals with the same level of coverage, individual with prescriptions and dental that Ms. Childs had. I believe that's correct. I believe the next number, $437, is also correct. However, what Mr. Goldberg doesn't state is that there are two factors. The first is the total cost, the per contract cost, not just individual coverage, but taking into account all the coverages. It was $517.07 per employee across the board for the 2009-2010 contract year. For the 2010-2011 contract year where the plaintiff says, see, they fired me and look how much it went down, the per contract cost over the entire organization actually went up 6.6% to $551.18. So that's one issue. The other issue is if you look at the benefit statements and if you look at all of the very fine print language that's in there, the individuals who had the type of coverage that Ms. Childs had, their deductible increased by 100%, their out-of-pocket increased by 50%, their out-of-network increased, it was either by 80% or 100%. So while the cost to the employer may have gone down a little bit, the cost to the employee actually increased. So there is no real benefit. The other issue that the plaintiff doesn't really deal with is they fired Ms. Childs, but they offered her COBRA. And, I mean, I realize that they're required to offer her COBRA, but they did. And in doing so, how are they going to get any benefit from firing her? If she takes COBRA, they still have to pay for it. And the plaintiff wants to argue, well, I couldn't afford COBRA. Is COBRA permanent? Excuse me? Is COBRA permanent? At the time that they offered her the COBRA, she could have been on it for up to 36 months. But she takes another job, and they have benefits, and she would be off, right? To the extent that they actually benefited, and that was their motivation, sure. If she doesn't take the COBRA or if she gets another job, I guess they benefit. But the facts are that they didn't really benefit, one. And, two, there's absolutely no evidence that that was their motivation for terminating her. They terminated her because she was a bad employee. That's what the performance reviews say. But that's not what they told the EEOC. I mean, when they know that there's a charge of discrimination, I mean, the rubber is hitting the road here. They have a lawyer. The lawyer writes a letter, and he says it's solely for business reasons, and it's related to a restructure. Now, taking that in the light most favorable to the plaintiff, which we have to, couldn't the reasonable fact finder then say that there's a pretext because there's a shifting or inconsistent explanation when you say, oh, we filed her for performance reasons, and it was really the thing that really sticks out as a scanning mistake? Because even in the EEOC letter, there are some performance issues that are mentioned, but no scanning mistakes are mentioned in the letter. So I don't see how you can say that there's not enough evidence to find pretext. Well, I see that I've significantly passed my time, but I'll try and answer this as quickly as I can. The court considered all of the evidence. Everything that was before her, and said, considering all of this evidence, and even considering that there was this somewhat shifting reason, although they did mention performance, and then that sort of got refined and became very clear what the actual performance issue was, that at the time that the court made its determination and considered all of the evidence, found no pretext, and frankly found that the reason was didn't just say that it was a reason, but it said it was a legitimate reason that she was a bad employee and the employer has the right to make that decision, and cited the case where it's not the district court's province to act as a super human resource department and determine whether or not it was a good idea or a bad idea, but simply did they act within the law. And I think taking all of the evidence into consideration that the court determined that the plaintiff simply had no evidence and the plaintiff's effort to just throw stones and say, oh, they're wrong about this, they're wrong about this, they're wrong about this, wasn't enough, summary judgment, you have to have something, you have to have some evidence, and the district court determined that the plaintiff just didn't have any evidence and therefore ruled in our favor, and I believe that the proper course for this court is to affirm that decision. Thank you. Thank you. Did Mr. Goldberg have any time left? You may have two minutes. I just want to, two brief points, and then I'd like to answer your question, Judge Wilkins. Why don't I do that first? The citations that you requested in the table, the move from 308 to 375 is at JA1137. The move from 375 to 449 is at JA1119. Now, I'd also like to address two things that Mr. Hyman mentioned. The first is the question about a super human resources department. The cases that say that are essentially judging between two admittedly qualified individuals, and the court says, and this court has said, once we know they're qualified, we're not going to decide who's a little more qualified. But at the same time, this court and other courts have said that we do have to figure out whether these potentially pretextual reasons are real. Is there really a performance issue or not? Second, I'd like to provide the court with a few references on the associational issue for the APA. Those are what's been called a seminal decision in Seventh Circuit, Larimer v. IBM Corp., 370 F. 3rd, 698, Trulio, T-R-U-J-I-L-L-O v. Pacific Corp., 524 F. 3rd, 1149 in the Tenth Circuit. There are a number of others. There are some reported, some unreported, but Larimer is really the seminal one, and they all flow, most flow from that. If there are no further questions. All right. Thank you. Thank you very much. The case will be submitted.
judges: Brown, Srinivasan, Wilkins